No. 99-053

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 357

303 Mont. 274

16 P. 3d 1002

COLLEEN KAREN SCHUFF, individually and

as personal representative of the ESTATE of

WILLIAM SCHUFF, Deceased, ADAM SCHUFF,

and JACOB SCHUFF,

Plaintiffs, Respondents, and Cross-Appellants,

v..

A.T. KLEMENS & SON,

Defendant, Appellant and Cross-Respondent.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade

The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kevin C. Meek, Tiffany B. Lonnevik, Davis, Hatley, Haffeman & Tighe, Great Falls, Montana

For Respondents:

Charles R. Johnson, Sara R. Sexe, Marra, Wenz & Johnson, Great Falls, Montana

For Amici:

Neil E. Ugrin, Roger T. Witt, Ugrin, Alexander, Zadick & Higgins, Great Falls, Montana (James, Gray, Bronson & Swanberg, Attorneys at law); John Richardson, Beck & Richardson, Bozeman, Montana (Montana Trial Lawyers Association)

Heard: April 4, 2000

Submitted: June 28, 2000

Decided: December 27, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 A.T. Klemens & Son (Klemens) appeals from a judgment resulting from a wrongful death claim entered in favor of Colleen Karen Schuff, and her sons, Adam and Jacob Schuff (Schuff), by the Eighth Judicial District Court, Cascade County. Schuff, both individually and as a personal representative of the estate of her deceased husband, cross-appeals the judgment, asserting that the court erred in reducing the judgment award and in calculating judgment interest.

¶2 We affirm in part, reverse in part, and remand for further proceedings.

¶3 Klemens raises the following issues:

> 1. Did the District Court abuse its discretion when it denied Klemens' motion to disqualify the Marra firm from representing Schuff?
>
> 2. Did the District Court abuse its discretion when it entered a default judgment

against Klemens on the issue of liability as a sanction under Montana Rules of Civil Procedure 37(d) for alleged discovery abuses?

Subject to Schuff's cross-appeal as well as Klemens' appeal, we address the following issues:

3. Does Article II, Section 16, of the Montana Constitution create a fundamental right to recover attorney's fees and costs?

4. Did the District Court err when it reduced the jury verdict *pro tanto* based on Schuff's prior settlement with the other named defendants?

5. Did the District Court err in its collateral source reduction determinations regarding workers' compensation and Social Security benefits?

6. Did the District Court err when it limited Schuff's recovery of prejudgment interest?

7. Did the District Court err in determining the proper date for post-judgment interest?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Schuff initiated this action in 1991 to recover damages for the alleged wrongful death of her husband, William Schuff, who died as a result of burns sustained at the M&H Gas Station in Great Falls, Montana. The accident occurred on September 12, 1991, while Schuff's husband, an employee of Kenneco, Inc., was repairing a submersible pump in a manhole above an underground gasoline storage tank at the station. Accumulated gas fumes ignited, and engulfed Schuff in flames. He died from the resulting severe burn injuries on September 25, 1991.

¶5 Schuff's theory of negligence, in part, blamed the accident on either a mislabeled electrical relay switch and/or a mis-wired relay switch, which deceived William Schuff into turning off the wrong relay switch, and thereby providing an ignition source. Schuff alleged that the fumes accumulated due to a defective pump. On October 29, 1998, a jury returned a verdict in Schuff's favor in the amount of $1,303,000.

¶6 After filing her original complaint against M&H Gas Company and three John Does on

October 4, 1991, Schuff filed an amended complaint naming Klemens as well as another electrical contractor and the manufacturer of the submersible pump as additional defendants on January 31, 1992. A.T. Klemens & Son, an electrical contractor, was one of several contractors that had performed electrical work for M&H at the gas station where the accident occurred.

¶7 Klemens was served with a copy of the amended complaint on February 3, 1992. The District Court would find, in its Order granting Schuff's motion for default judgment, that Klemens "denied ever doing any work involving wiring of the submersible pump and relay system." Klemens claimed that it had not performed any of the alleged negligent work, including installing faulty wiring or mislabeling the electrical system related to the submersible pump. In its December 14, 1994 motion for summary judgment, Klemens asserted that:

> It is uncontroverted that Kenneco and other electrical contractors did all design, installation and maintenance work on the M&H gasoline pumping system as it was configured at the time of the accident. A.T. Klemens did nothing more [than] connect the gasoline pumping system as wired to a new electrical service panel for the building. There was nothing wrong with the electrical service panel and it had no involvement in the accident because Mr. Schuff intentionally did not use the breaker panel to cut power to the west pump.

¶8 This blanket denial was substantiated by Klemens' discovery responses as well as the depositions of its employees who had performed the work at the gas station. Although claiming that a thorough disclosure of the resulting paper trail for the work performed was irrelevant and burdensome, Klemens nevertheless offered that all records could be examined at its counsel's office.

¶9 Needless to say, the litigation of the matter, now approaching its tenth year, was less than tractable.

¶10 One focal point of the dispute arose in 1993 when counsel for Klemens filed a motion to disqualify the Great Falls law firm of Marra, Wenz, Johnson & Hopkins (hereinafter the Marra firm) from continuing to represent Schuff. The basis for the motion to disqualify stemmed from the Marra firm's existing representation of Klemens, an ongoing relationship that had formed in 1984. At the time the Marra firm served Klemens with Schuff's amended answer, Klemens claims it had pending legal matters that were being

addressed by the Marra firm on its behalf, including the monitoring of another lawsuit against Klemens. These legal matters allegedly provided the Marra firm with access to Klemens' financial information, which apparently included knowledge of a $1 million liability insurance policy.

¶11 Prior to filing the motion, Klemens claims that it requested that the Marra firm either withdraw as Schuff's counsel or agree to dismiss Klemens with prejudice based upon ethical considerations. These overtures were refused by the Marra firm, which informed Klemens' new counsel that "We discussed whether or not there was any conflict of interest, and concluded that there was none."

¶12 The Marra firm asserted to the court that there was "no substantial possibility that any information they have previously acquired or may acquire in the future relative to Klemens corporation could have any adverse influence on Klemens in this lawsuit," and dismissed Klemens' motion to disqualify as "frivolous." Primarily, the firm asserted that there was no substantial relationship between the work performed over the years for Klemens and Schuff's wrongful death claim, which could conceivably cast fault on Klemens for its electrical work at M&H. Nevertheless, the Marra firm terminated its relationship with Klemens prior to the court's ruling on the motion to disqualify "to prevent the possibility of any acquisition of information which could be used to the detriment of Klemens in the litigation."

¶13 The District Court denied Klemens' motion in an order entered September 3, 1993, applying a "substantial relationship" analysis to the Marra firm's representation of Schuff and Klemens.

¶14 Also in dispute here is the liability default judgment entered against Klemens resulting from its conduct during discovery.

¶15 In earlier 1993, Klemens was served with interrogatories and requests for production from co-defendant M&H Gas Company. Klemens objected to much of the requests as either irrelevant or unduly burdensome. Nevertheless, Klemens claims that it provided the records up to the date of the accident by making them available for inspection at its counsel's office. Klemens responded to an interrogatory request for work performed at the gas station with:

Copies of records for work done by Klemens at M&H up to the date of the accident

are available for inspection at the office of James, Gray and McCafferty. Generally, what is known about the work described in the records, with regard to the questions asked above, is contained in these records.

In response to an interrogatory request for information regarding "any electrical wiring installation or hookup, including that for any submersible fuel pumps," Klemens replied that: "Klemens' only work was to refeed wiring through conduit and no designing or engineer was required." Further, in response to a request for production of "every contract, subcontract, plan, specifications, drawing, work order, invoice, building permit, inspection report, or other documents, including correspondence, which pertain to work of any kind or nature performed on the premises of the M&H Gas Station," Klemens replied by referring back to its response that such records were available for inspection at the office of James, Gray and McCafferty. Klemens again referred to this particular response in reply to a request for "all sales documents, invoices, shipping slips, or other documents" that related to the "manufacture, inspection, sale, or delivery of materials and equipment furnished for work at the M&H Gas Station."

¶16 The District Court found that Klemens' response to the foregoing interrogatories and requests for production clearly indicated that Klemens did not do any of the alleged negligent electrical work as set forth by Schuff's theory of the case. The court then observed that Klemens' employee, Wayne Anderson, failed to produce these requested documents at his October 18, 1994 deposition. Anderson's deposition testimony, the court found, was consistent with Klemens' assertion that it had only replaced an electrical service panel, connecting it to existing circuits.

¶17 Next, the court observed that counsel for Klemens also frustrated the depositions of its expert witnesses with delay and a refusal to make one witness available--all the while contending that their witnesses' testimony would be redundant and immaterial.

¶18 On November 8, 1996, a paralegal working for Schuff's counsel went to McCafferty's office to examine the documents. The paralegal copied 211 pages of documents, including documents indicating that Klemens had relocated the conduit running to the submersible gas pumps in June of 1989 and had installed pilot lights on submersible pump relays in February of 1991. The court found that it was "clear from these documents that Klemens did much more extensive work at M&H than it had claimed in the preceding four years--work which may well have resulted in the miswiring and/or mislabeling of the submersible pump circuits." The court further found that:

From the documents it is apparent that Darrel Anderson, who denied knowledge of any work by Klemens on the wiring of the submersible gas pumps, did 6 ½ hours of work relocating the conduit to the submersible pumps. His partner in this project was Dennis Zaremski, one of the witnesses that Klemens would not produce and to whom Mr. Fairclough stated that he had spoken, and who did not remember anything except that they had replaced a service panel.

¶19 The District Court, in light of the foregoing, turned to Rule 37(d), M.R.Civ.P., which permits a court, under certain specific circumstances, to impose a default sanction without first issuing an order to compel discovery. The court stated that "[a]lthough Plaintiff's counsel probably should have reviewed the documents earlier, in view of the representations of the opposition, it is understandable that this was not done until shortly before trial."

¶20 The court concluded that Klemens committed "no less than four direct discovery violations" that were subject to Rule 37(d), M.R.Civ.P. The court concluded that "[c]onsidering all of this evidence together . . . the concealment of this information over a period of 3 ½ years, from the first service of interrogatories, was willful and in bad faith." Consequently, the court granted Schuff's motion for default judgment on the issue of liability on November 19, 1997.[1]

¶21 Schuff would settle prior to trial with the two other named Defendants, M&H Gas Company, and The Marley Company, which designed and manufactured the pump involved in the accident. A jury rendered a verdict against Klemens on October 29, 1998. A judgment in favor of Schuff was entered on October 30, 1998, providing $203,000 for medical and funeral expenses; $100,000 for pain and suffering of the deceased; $600,000 for lost earnings of the deceased; and $400,000 for loss of society, for a total of $1,303,000.00.

¶22 Post-judgment motions by both parties ensued. Schuff argued that in addition to the $1.3 million judgment she was legally entitled to $166,689.80 in prejudgment interest on the medical and funeral expenses award, and $49,303.73 prejudgment interest on the lost earnings award. Klemens claimed that the jury award should be reduced by the amount of Schuff's prior settlement with the other defendants, the $203,000 paid to Schuff by her deceased husband's employer's workers' compensation carrier for medical and funeral expenses, and the continuing workers' compensation and Social Security death and

survivor benefits received by Schuff and her children. In response, Schuff claimed that the collateral source reductions or offsets were inappropriate, pursuant to the Montana Constitution's right to "full legal redress" under Article II, Section 16, because once attorney's fees and such offsets were deducted, Schuff's "redress" would be less than zero.

¶23 The District Court issued an order and amended judgment on January 4, 1999. The District Court concluded that Schuff was not entitled to prejudgment interest for the medical and funeral expenses received from workers' compensation, or for the lost earnings award. As for the collateral source reductions themselves, the court determined Klemens was entitled to reduce the verdict amount by the $203,000 received by Schuff from workers' compensation for payment of medical and funeral expenses. The court further determined that the continuing workers' compensation and social security death and survivor benefits received by Schuff and her family were not collateral sources, and therefore could not be deducted from the jury verdict. The court also determined that Klemens could offset the jury verdict by the amount Schuff received in settlement from the two other defendants.

¶24 The court nevertheless determined that the collateral source statutes and the *pro tanto* settlement offset standard announced in *State ex rel. Deere v. District Court* (1986), 224 Mont. 384, 730 P.2d 396, were unconstitutional to the extent that they denied Schuff "full legal redress," which it determined is synonymous with "full compensation." Therefore, the court determined that Klemens' claims for collateral source reduction and offset must be reduced by the costs of recovery to Schuff, including "reasonable" attorney's fees. After deducting the collateral source payments and settlement offset from the $1,303,000 verdict, the court then added back in $553,685.96, representing $498,185.96 in contingency fees,[(2)] and $55,500.00 for a workers' compensation subrogation settlement. Thus, the court determined that the judgment against Klemens was $978,685.96.

¶25 Klemens appealed the denial of the motion to disqualify the Marra firm, the default discovery sanction, and the District Court's determination of the ultimate damage award. Schuff cross-appealed on the issue of the constitutionality of the collateral source and offset rulings of the District Court, as well as the court's award of judgment interest.

## STANDARD OF REVIEW

¶26 The denial of a motion to disqualify is within a district court's discretionary powers, and therefore we will review its decision for an abuse of discretion. *See In re*

*Guardianship of Mowrer*, 1999 MT 73, ¶ 24, 294 Mont. 35, ¶ 24, 979 P.2d 156, ¶ 24. We also review the District Court's imposition of sanctions in the form of a default judgment for an abuse of discretion. *Eisenmenger by Eisenmenger v. Ethicon, Inc.* (1994), 264 Mont. 393, 402, 871 P.2d 1313, 1319, *cert. denied* (1994), 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 211 (addressing propriety of sanctions for discovery abuses imposed pursuant to Rule 37(d), M.R.Civ.P.).

¶27 We have concluded that in determining whether the trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court, but, rather, did the trial court in the exercise of its discretion act arbitrarily without the employment of conscientious judgment or exceed the bounds of reason, in view of all the circumstances, ignoring recognized principles resulting in substantial injustice. *See Campbell v. Bozeman Investors of Duluth*, 1998 MT 204, ¶ 34, 290 Mont. 374, ¶ 34, 964 P.2d 41, ¶ 34 (citations omitted).

¶28 Our review of questions involving constitutional law is plenary. *State v. Schnittgen* (1996), 277 Mont. 291, 295, 922 P.2d 500, 503. A court's resolution of an issue involving a question of constitutional law is a conclusion of law which we review to determine whether the conclusion is correct. *Schnittgen*, 277 Mont. at 295-96, 922 P.2d at 503.

¶29 The reduction of a jury award based on a collateral source statute, as well as awarding judgment interest, which is also statutory, are questions of law, and therefore, we examine whether the district court was correct in its application of the law. The same holds true for a district court's offset of a judgment based on a plaintiff's prior settlement with other tortfeasors. *See Liedle v. State Farm Mut. Auto. Ins. Co.* (1997), 283 Mont. 129, 132, 938 P.2d 1379, 1380-81; *Dew v. Dower* (1993), 258 Mont. 114, 125, 852 P.2d 549, 556; *Jim's Excavating Serv., Inc. v. HKM Associates* (1994), 265 Mont. 494, 515, 878 P.2d 248, 260.

## DISCUSSION

¶30 Before addressing the extensive issues raised by both parties, a preliminary discussion of the alleged violation of one of Montana's Rules of Professional Conduct is necessary. Klemens contends that the Marra firm clearly violated Rule 1.7(a) of the Montana Rules of Professional Conduct when it brought suit against Klemens, its client, on behalf of Schuff.

¶31 Rule 1.7(a), M.R.Pro.C., provides that a lawyer shall not represent a client if the

representation of that client will be directly adverse to another client, unless the lawyer first "reasonably believes the representation will not adversely affect the relationship with the other client" and then "each client consents after consultation." Klemens claims that the alleged conflict of interest in the Marra firm's representation of Schuff "so tainted the legal proceedings before the district court that the participation of the Marra firm as counsel for Schuff should be rendered void and Klemens allowed a new trial with respect to both liability and damages."

¶32 This argument raises two inevitable questions: first, may such an alleged rule violation be determined, as a matter of law, by a district court, and if so, what effect does a proven violation have in an underlying civil proceeding. As this Court has stated, "[m]erely reciting a rule does not establish a violation." *State v. Lemmon* (1984), 214 Mont. 121, 126, 692 P.2d 455, 458. To date, these questions have been only marginally asked and answered, with no clear direction from this Court's holdings.

¶33 In Montana, it is beyond argument that this Court has original and exclusive jurisdiction in all matters involving the conduct of attorneys practicing law in this state. *See* Preamble, Rules on Lawyer Disciplinary Enforcement (citing Art. VII, § 2(3), of the Montana Constitution) (hereinafter R.L.D.E.); *Kradolfer v. Smith* (1990), 246 Mont. 210, 213, 805 P.2d 1266, 1268 (quoting *Harlen v. City of Helena* (1984), 208 Mont. 45, 676 P.2d 191). Accordingly, this Court, and the agency to which it has delegated disciplinary authority, the Commission on Practice, has the exclusive authority to discipline or sanction the unprofessional conduct of attorneys admitted to practice before it. *See* Rule 6, R.L.D. E. Pursuant to our original and exclusive jurisdiction, this Court adopted the Rules of Professional Conduct in 1984, to take effect on July 1, 1985. We ordered that the rules "shall apply to all questions of conduct of members of the State Bar of Montana . . ." *See* Montana Supreme Court Order No. 84-303, *reprinted in* State Bar of Montana's 2000 Lawyers' Deskbook & Directory, at 237.

¶34 Unquestionably, therefore, a party cannot receive relief from a district court for the mere misconduct of an attorney or firm. A district court lacks the necessary jurisdiction for such adjudication. Further, as this Court has observed, a violation of a professional conduct rule "should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached." *Carlson v. Morton* (1987), 229 Mont. 234, 238, 745 P.2d 1133, 1136 (quoting from the Preamble to the Model Rules of Professional Conduct). Likewise, the Preamble acknowledged by this Court in *Carlson* provides that the "purpose of the Rules can be subverted when they are invoked by opposing parties as procedural

weapons."[(3)](#) *Carlson*, 229 Mont. at 238, 745 P.2d at 1136. As the Ninth Circuit Court of Appeals stated in a case arising in California, the "Rules of Professional Conduct do not establish substantive legal duties--they neither create, augment nor diminish any duties." *In re Kirsh* (9th Cir. 1992), 973 F.2d 1454, 1461 (stating that a rule violation, standing alone, does not prove that a fiduciary duty has been breached). In *Carlson* we concluded that the Appellant "must prove not that various disciplinary rules were breached in his opinion; rather he must demonstrate that [the attorney] failed in his legal duty." *Carlson*, 229 Mont. at 240, 745 P.2d at 1137 (discussing legal malpractice, and determining that expert testimony is required to establish that attorney departed from prevalent standard of care).

¶35 As an Illinois state court suggested, however, a trial court may consider attorney violations of the Rules of Professional Conduct if that misconduct results in prejudice or adversely impacts the rights of the parties in the case pending before it. *See Beale v. Edgemark Financial Corp.* (Ill.App.Ct. 1998), 697 N.E.2d 820, 827. We agree with the Illinois court's reasoning. One common example of where a court may consider a professional conduct rule violation--which is at issue here--is the disqualification of an attorney due to a conflict of interest. *See In re Guardianship of Mowrer*, 1999 MT 73, ¶¶ 19-20, 294 Mont. 35, ¶¶ 19-20, 979 P.2d 156, ¶¶ 19-20 (alleged conflict based on Rules 1.8 and 1.9, M.R.Pro.C.); *State v. Lemmon* (1984), 214 Mont. 121, 126-27, 692 P.2d 455, 458 (alleged conflict based on Canon 5, Model Code of Professional Responsibility, which predated our current rules of professional conduct). A district court's discretion in this regard flows from its inherent authority to control trial administration in the interest of fairness and justice. *See*, *e.g.*, *Anderson v. Werner Enterprises, Inc.*, 1998 MT 333, ¶ 13, 292 Mont. 284, ¶ 13, 972 P.2d 806, ¶ 13. *See also* § 3-1-111, MCA (granting all courts the power to provide for the orderly conduct of proceedings, and control, in furtherance of justice, the conduct of all other persons in any manner connected with a judicial proceeding).

¶36 Thus, the gravamen of a motion to disqualify is not that an attorney or firm violated one of the conflict of interest rules under our Rules of Professional Conduct (*see*, *e.g.*, Rules 1.7, 1.8, 1.9, 1.10, 1.16, M.R.Pro.C.); rather, a motion to disqualify must offer sufficient proof that the continued representation of one party by the attorney or firm will prejudice or adversely impact the rights of another party in the matter pending before the court. Evidence demonstrating that an attorney or firm did, in fact, violate a professional conduct rule merely serves as additional weight that may tip the scales in favor of disqualification.

¶37 Thus, a proven or admitted rule violation is not *prima facie* grounds for disqualification--or any other relief sought from a district court, for that matter. Likewise, the disqualification of an attorney or firm, or any other sanction, based solely on a rule violation--absent sufficient proof of prejudice--would likely exceed a district court's jurisdiction, in that the sanction would be nothing more than a means of "punishing" the attorney or firm for the violation. *See generally Beale*, 697 N.E.2d at 828-29. Conversely, a district court may, in its discretion, conclude that any number of professional conduct rules were violated, as a matter of law, and yet nevertheless permit an attorney or firm to proceed in its representation of a client. *See generally In re Kirsh*, 973 F.2d at 1461 (concluding that a violation of professional conduct rule requiring attorney to refrain from entering into business transactions with clients did not preclude attorney, who loaned money to clients, from later filing petition in clients' bankruptcy proceedings). Even so, an attorney or a firm subsequently may be subject to discipline by our Commission on Practice for the rule violations--even though a district court ruled that the conduct was not prejudicial to one of the parties to the litigation.

¶38 With this said, it is critical to the case before us to emphasize that counsel for the party moving for disqualification is also bound by the rules adopted by this Court, including the rule that requires lawyers under certain circumstances to report professional misconduct. *See* Rule 8.3(a), M.R.Pro.C. (lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, *shall* inform the appropriate professional authority) (emphasis added).

¶39 In light of the foregoing discussion, we now turn to the issues at hand.

## Issue 1.

### Did the District Court abuse its discretion when it denied Klemens' motion to disqualify the Marra firm from representing Schuff?

¶40 The District Court denied Klemens' motion to disqualify on September 3, 1993. From that date forward, Klemens did not once renew its concern for the "tainted legal proceedings" that allegedly followed, including in its post-judgment motions to amend. Thus, in light of the foregoing discussion, Klemens did not present any evidence to the

District Court that it was prejudiced or that its rights were adversely impacted by the Marra firm's representation of Schuff subsequent to the court's denial of its motion to disqualify. Likewise, the relief sought from this Court--a new trial, including adjudication on liability--was not requested at any time from the District Court.

¶41 Schuff argues, therefore, that Klemens should be barred from making its claim now, six years later, based on the equitable doctrine of laches. In principle, we agree with Schuff's laches argument, but need not pursue that theory in resolving this issue in its favor. However, in light of our ultimate determination of this issue, a review of the merits of Klemens' claim is warranted.

¶42 Rule 1.7(a) of the Montana Rules of Professional Conduct provides that a lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation. This rule must be viewed in light of Rule 1.16, M.R.Pro.C., which provides that a lawyer must decline or withdraw from representing a client if "(1) the representation will result in violation of the rules of professional conduct or other law."

¶43 These rules arise out of the fundamental principle that an attorney, as a fiduciary, owes a duty of undivided loyalty to his or her client. *See Joyce v. Garnaas*, 1999 MT 170, ¶ 32, 295 Mont. 198, ¶ 32, 983 P.2d 369, ¶ 32 (Trieweiler, J., dissenting) (quoting 1 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 11.1, at 631 (3d ed.1989)). *See also In re Anonymous* (Ind. 1995), 654 N.E.2d 1128, 1129-30 (concluding that lawyer violated Rule 1.16(a)(1), and should have withdrawn from representation of current client when he used information gathered from former client to maintain action against client in later litigation).

¶44 Klemens goes to great lengths to articulate precisely how Rule 1.7(a) should be construed in its favor. In the absence of clear Montana case law precedent, Klemens' reliance on a California state court decision, *Flatt v. Superior Court* (Cal. 1994), 885 P.2d 950, is inarguably well-founded, as is its reliance on current authority from other jurisdictions. Its application of these authorities to the factual scenario that arose when the Marra firm chose to represent Schuff and eventually drop Klemens like a "hot potato" is certainly well drawn. Klemens correctly asserts that at no time did it consent in writing to the Marra firm's representation of Schuff, nor is there any evidence that the required consultation and consent, required by the Rules of Professional Conduct, was ever sought

by the Marra firm from Klemens, once the apparent conflict arose.

¶45 Further, Klemens is also correct in pointing out that the Marra firm conveniently failed to discuss the required consent and consultation under Rule 1.7(a)(2) throughout this dispute, and that the District Court, in its 1993 order denying Klemens' motion to disqualify, did not reference this factor either, but instead applied a "former" client test for disqualification. *See*, *e.g.*, *Trust Corp. of Montana v. Piper Aircraft Corp.* (9th Cir. 1983), 701 F.2d 85, 87 (stating that the relevant test for disqualification is whether the *former* representation is *substantially related* to the current representation) (emphasis added). *But see Unified Sewerage Agency of Wash. County v. Jelco Inc.* (9th Cir. 1981), 646 F.2d 1339, 1344-45 (stating that representation adverse to a *present* client must be measured not so much against the similarities in litigation, as "against the duty of undivided loyalty which an attorney owes to each of his clients," and further providing that this present-client standard continues *even though the representation ceases prior to filing of the motion to disqualify*) (emphasis added).

¶46 Nevertheless, in moving to disqualify in the first instance Klemens should have been aware that, as a general rule, "[a]lleged lawyer conflict of interest problems should be brought up as early as possible so that a determination may be made that does not unduly prejudice any party." *In re Guardianship of Mowrer*, 1999 MT 73, ¶ 23, 294 Mont. 35, ¶ 23, 979 P.2d 156, ¶ 23 (citing *Trust Corp. of Montana v. Piper Aircraft Corp.* (9th Cir.1983), 701 F.2d 85, 88). In *Mowrer*, we concluded that even if a conflict of interest had occurred (having found none), "under the circumstances . . . failure to object and move to disqualify within a reasonable time would constitute a *de facto* consent to Christiansen's continued representation of Mowrer and a waiver of the right to object." *Guardianship of Mowrer*, ¶ 23.

¶47 The Ninth Circuit, in *Trust Corp. of Montana*, followed the well-settled rule that a former client who is entitled to object to an attorney representing an opposing party based on a conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right. *See Trust Corp. of Montana*, 701 F.2d at 87 (citing *Central Milk Producers Co-op v. Sentry Food Stores* (8th Cir. 1978), 573 F.2d 988, 992; and *Redd v. Shell Oil Co.* (10th Cir. 1975), 518 F.2d 311, 315).

¶48 Although readily distinguishable by the facts here--namely, Klemens initiated the motion to disqualify in a timely manner--the fact remains that several viable options to forestall the looming ineradicable harm rested in its hands as lengthy discovery ensued

and this matter eventually went to trial five years after the court denied its motion to disqualify.

¶49 For starters, the motion to disqualify should have been attached to a request for an injunction under the irreparable harm theory.[4] If denied, the district court's order could have been reviewed by this Court subject to an interlocutory appeal, without awaiting the outcome of the related litigation. *See* Rule (1)(b)(2), M.R.App.P. (permitting interlocutory appeal from an order granting or refusing to grant an injunction). Such an appeal could have led to an order staying the proceedings below. *See* Rule (1)(b)(2) M.R.App.P.

¶50 Although failing to seek a remedy that would have clearly given rise to an interlocutory appeal, Klemens could have nevertheless sought a writ of supervisory control, arguing that the alleged taint of the Marra firm's representation of Schuff would render any future remedy by appeal inadequate. *See Plumb v. Fourth Jud. Dist. Court* (1996), 279 Mont. 363, 368-69, 927 P.2d 1011, 1014 (citations omitted). Or, alternatively, Klemens could have sought certification of the order pursuant to Rule 54(b), M.R.Civ.P., arguing that the issue of disqualification was a matter unrelated to the merits of the underlying litigation. *See*, *e.g.*, *Roy v. Neibauer* (1980), 188 Mont. 81, 87, 610 P.2d 1185, 1189 (listing five factors and three "guiding principles" that court should consider in making a Rule 54(b) certification) (citations omitted).

¶51 At the very least, it can be argued that counsel for Klemens failed to observe the Rules of Professional Conduct by not promptly reporting the alleged violation to the Commission on Practice. *See* Rule 8.3(a), M.R.Pro.C. (requiring lawyers to report rule violations). If the "obvious" prejudice suffered by its client was in fact so severe, and the court's failure to disqualify the Marra firm was "entirely inconsistent with public policy," it would seem that a reasonable course of action would include the timely observance of Rule 8.3's mandate.

¶52 Instead, what the record reveals is that Klemens did nothing for six years. In this sense, we agree with Schuff's laches argument: in view of such an unexplained delay, it would be inequitable to permit a party to assert its rights. *See Kelleher v. Board of Soc. Work Exam'rs & Licensed Prof'l Counselors* (1997), 283 Mont. 188, 191, 939 P.2d 1003, 1005 (citations omitted).

¶53 Here, the "unexplained delay" is further compounded by the fact that Klemens' original request for relief is moot at this point. Indeed, Klemens' claim for relief has

changed--dramatically. At the time of its motion in 1993, Klemens sought nothing more than for Schuff to find another attorney, or, far more generously, to dismiss her claim against Klemens. Now, after six years of silence, Klemens seeks a new trial on the merits--including the issue of liability which was deemed admitted pursuant to a subsequent discovery sanction default judgment. As we have often stated, we do not address substantive and procedural issues raised for the first time on appeal, which includes a party's change in legal theory. *See Day v. Payne* (1996), 280 Mont. 273, 276, 929 P.2d 864, 866 (citation omitted). More specifically, a "change in legal theory" includes a change in a request for relief or for a particular remedy. Thus, a party may not request relief or remedy on appeal that was not presented to the trial court. *See generally Peretti v. State* (1989), 238 Mont. 239, 245, 777 P.2d 329, 333. Accordingly, on these grounds we hold that the District Court's 1993 order denying Klemens' motion to disqualify is affirmed.

¶54 Nevertheless, Klemens focusses our attention not so much on the District Court's denial of its motion but on the subsequent results: the alleged "tainted" legal proceedings. As previously discussed, such a contention must be supported by evidence of prejudice. *See*, *e.g.*, *First Small Business Inv. Co. v. Intercapital Corp.* (Wash. 1987), 738 P.2d 263, 267 (holding that when a motion for disqualification is challenged after judgment has been entered, the judgment will not be reversed unless the breach of ethics prejudiced the interests of the former client).

¶55 On appeal, Klemens claims that "Schuff's counsel was in possession of the most intimate and detailed financial information of Klemens." Even so, Klemens offers no specific details of how this information--which presumably could otherwise be obtained through discovery--was used by Schuff through the course of litigation to its prejudice. Klemens then vaguely claims that the Marra firm "knew the concerns, attitudes, and approaches that Klemens wanted undertaken in conjunction with defending itself in lawsuits where excess verdict[s] were a possibility." Again, even if Schuff possessed such "knowledge," Klemens fails to explain if and how Schuff unfairly used such information to its detriment during the course of litigation. Finally, Klemens claims that it was prejudiced by the alleged fact that counsel for Schuff assured the court at the disqualification hearing that it only sought recovery of Klemens' insurance policy limits, which purportedly were $1 million, and then proceeded to seek a judgment in excess of that amount.[(5)] Assuming this is true, how this relates to the alleged conflict of interest and any ensuing prejudice at trial is never substantiated.

¶56 Therefore, even if we were to assume, arguendo, that counsel in the Marra firm

violated Rule 1.7(a), or other related rules in its representation of Schuff, we conclude that the subsequent alleged prejudice suffered by Klemens is not supported by substantial evidence. In light of our prior discussion, a violation of a professional conduct rule standing alone is not sufficient to sustain a claim for relief by a party. Prejudice must be proven. Thus, the District Court's order denying Klemens' motion to disqualify is affirmed.

¶57 Nevertheless, that does not end this matter. Pursuant this Court's singular jurisdiction under Article VII, Section 2(3), of the Montana Constitution over matters pertaining to lawyer discipline and claimed violations of the M.R.Pro.C., we conclude that the conduct of Schuff's counsel and of Klemens' trial and appellate counsel as regards those claimed violations, must be referred to the Commission on Practice. If the Commission's further investigation reveals violations of the M.R.Pro.C. as regards counsels' conduct in this case, then the Commission may pursue appropriate prosecutions and recommendations for discipline as the facts and law may, in the Commission's discretion, warrant.

¶58 In making this referral we emphasize for the benefit of counsel and the Commission that we have reached no conclusion as to the merits of any claimed or alleged violations by counsel of the M.R.Pro.C., except to the extent that any such violations, even if proven by the requisite clear and convincing evidence, have not prejudiced any party's substantial rights to a fair trial in the underlying cause. Under the facts presented we determine only that Schuff's counsel's conduct in connection with the alleged conflict of interest in question and that Klemens' counsels' apparent decision not to report this alleged violation warrants further examination by the Commission in the context of a possible discipline inquiry.

¶59 That said, the practicing bar should understand that the situation presented in this case is unusual. On the one hand, both in the trial court and on appeal, Klemens' counsel have maintained that Schuff's counsel engaged in unethical conduct so serious that we should reverse the trial judge's pretrial disqualification of counsel ruling; that we should set aside a substantial jury verdict in favor of an innocent widow and her children; and that we should send a case that already has been in litigation for ten years back to the District Court for retrial. We assume that Klemens' counsel has made these arguments in good faith with the view and expectation that we would grant the relief requested. And if, in fact, the Commission determines that Schuff's counsel did engage in unethical conduct as serious as Klemens' counsel claims, then, no doubt, the Commission will deal with that in an appropriate manner.

¶60 On the other hand, if Klemens' counsel did view Schuff's counsel's conduct as being as serious as claimed, then it is, likewise, appropriate that the Commission make inquiry into why such violations were not reported to the disciplinary authority with jurisdiction to address those.

¶61 We again emphasize that the Montana Rules of Professional Conduct are not to be ignored for economic gain nor are they to be used--or rather abused--by opposing parties as procedural weapons to gain a tactical or strategic advantage in litigation. *See Carlson*, 229 Mont. at 238, 745 P.2d at 1136. The Rules encompass ethical standards by which all attorneys are expected to conduct their practice of law; the rules are there to protect the public in general and the lawyer's clients in particular. On the one hand, the prospect of earning a substantial fee does not justify ignoring the Rules. On the other hand, the Rules are not designed to be employed as arrows in the litigator's quiver, to be loosed from time to time at targets of opportunity as the ebb and flow of an adversarial proceeding may appear to dictate. Quite simply, a serious M.R.Pro.C. violation is a serious matter that needs to be taken seriously and reported promptly to the Commission.

¶62 For these reasons we refer this matter to the Commission for investigation and consideration of Schuff's counsel's conduct, as well as that of trial and appellate counsel for Klemens, and for a recommendation as to discipline if the Commission determines, after appropriate proceedings and the taking into consideration the requisite standard of proof, that any attorney involved in this cause violated the M.R.Pro.C.

## Issue 2.

***Did the District Court abuse its discretion when it entered a default judgment against Klemens on the issue of liability as a sanction under Montana Rules of Civil Procedure 37(d)?***

¶63 Klemens argues that the District Court abused its discretion when it entered a default judgment against it, pursuant to Rule 37(d), M.R.Civ.P.

¶64 A sanction under Rule 37(d), M.R.Civ.P., arises upon the occurrence of one of three events. Specifically, a sanction under this rule may be warranted if a party fails:

(1) to appear before the officer who is to take the deposition, after being served with

a proper notice, or (2) to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, or (3) to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request.

If one or more of these sanctionable events occur, then the court "in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under paragraphs (A), (B), and (C) of subdivision (b)(2) of this rule." Under Rule 37(b)(2)(C), a court may enter an order "rendering a judgment by default against the disobedient party." The rule also provides that the "failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has applied for a protective order as provided by Rule 26(c)." The record shows that at no time did Klemens move for such protection.

¶65 As a preliminary matter, we conclude that Klemens misconstrues the court's rationale for entering its default judgment pursuant to Rule 37(d), M.R.Civ.P. Klemens argues that the "lower court identified four alleged 'direct discovery violations' which when 'consider [ed] together' gave rise to Rule 37(d)(1)-(3) sanctions." Klemens asserts that "none of the four acts identified constituted discovery violations" and that it is "impossible to discern whether the court would have entered default judgment on the strength of any one violation." We disagree.

¶66 We conclude that the default judgment resulted from not four, but one Rule 37(d) violation in particular--the failure to answer interrogatories concerning the scope of work performed by Klemens at M&H Gas. Although the court in its written order identified four "direct discovery violations here falling under Rule 37(d), M.R.Civ.P.," it ultimately concluded that "[c]onsidering all of this evidence together . . . *the concealment of this information* over a period of 3 ½ years, from the first service of interrogatories, was willful and in bad faith." (Emphasis added). The court then stated that this *concealment* "clearly went to the heart of Plaintiff's claim and Klemens' defense." The court then explained how the *concealment*--and only the concealment--prejudiced Schuff's case. A review of the briefing and the hearing transcript leading up to the court's order indicates that this lone rationale pursuant to Rule 37(d)--the failure to serve answers to interrogatories submitted under Rule 33--was the basis for the court's decision.

¶67 In this instance, the court's identification of three other alleged discovery violations--

as well as other discovery-related misconduct identified in the order--merely serve as additional factors in its determination of an appropriate sanction; i.e., whether "the consequences imposed by the sanctions relate to the extent and nature of the actual discovery abuse." *See Maloney v. Home and Investment Center, Inc.,* 2000 MT 34, ¶ 35, 298 Mont. 213, ¶ 35, 994 P.2d 1124, ¶ 35 (citation omitted). The other misconduct identified by the court, therefore, merely serves to demonstrate the relevant "attitude of unresponsiveness" that Klemens argues now it never displayed, in determining the severity of the sanction. *See McKenzie v. Scheeler* (1997), 285 Mont. 500, 508, 949 P.2d 1168, 1172 (citations omitted).

¶68 Accordingly, our review of the court's order will be limited to whether it abused its discretion when it sanctioned Klemens for failing to answer interrogatories as specified under Rule 37(d), M.R.Civ.P., and whether this sanction was too severe, as Klemens contends.

¶69 In determining whether a district court has abused its discretion in rendering a discovery sanction, or that the sanction was too severe, this Court has recognized, that "[t]he trial judge is in the best position to know which parties callously disregard the rights of their opponents and other litigants seeking their day in court," and that "[t]he trial judge is also in the best position to determine which sanction is the most appropriate." *Eisenmenger*, 264 Mont. at 402-03, 871 P.2d at 1319 (citing *Dassori v. Roy Stanley Chevrolet Co.* (1986), 224 Mont. 178, 179-80, 728 P.2d 430, 431).

¶70 Further, this Court's position is that abuse of discovery must no longer be dealt with leniently and that the transgressors of discovery abuses should be punished rather than encouraged repeatedly to cooperate. *See Smith v. Butte-Silver Bow County* (1996), 276 Mont. 329, 332, 916 P.2d 91, 92-93 (reversing district court's dismissal with prejudice of non-compliant party's case). We have stated that concerns "related to crowded dockets and the responsibility to maintain fair and efficient judicial administration have shifted the traditional reluctance to impose discovery-related sanctions to a judicial intolerance of discovery abuses." *McKenzie*, 285 Mont. at 506, 949 P.2d at 1171-72.

¶71 Thus, the imposition of sanctions for failure to comply with discovery procedures is regarded with favor. *See McKenzie*, 285 Mont. at 506, 949 P.2d at 1172. It is, after all, a maxim of our rules of discovery that the price for dishonesty must be made unbearable to thwart the inevitable temptation that zealous advocacy inspires. *See generally Eisenmenger*, 264 Mont. at 406, 871 P.2d at 1321; *Owen v. F.A. Buttrey Co.* (1981), 192

Mont. 274, 280, 627 P.2d 1233, 1236. As a Michigan appellant court recently observed, "[g]iven the complexities of human affairs, the truth cannot always be found, but the fair search for it is why courts, lawyers and lawsuits exist," which is why when it is known, "the truth must always be spoken." *Traxler v. Ford Motor Co.* (Mich.Ct.App. 1998), 576 N.W.2d 398, 405 (Gribbs, J., concurring and dissenting) (quoting from trial court's opinion, and affirming default judgment for discovery violations).

¶72 In light of the foregoing proposition that we generally defer to the decision of the district court regarding the appropriate sanction for discovery abuses, this Court has identified three factors which we may consider in review of the court's order for abuse of discretion: (1) whether the consequences imposed by the sanctions relate to the extent and nature of the actual discovery abuse; (2) the extent of the prejudice to the opposing party which resulted from the discovery abuse; and (3) whether the court expressly warned the abusing party of the consequences. *See Maloney*, ¶ 35 (reviewing severity of sanction, where party admitted sanctions were proper) (citation omitted).

¶73 At the core of the discovery violations at issue here rests the facts surrounding the scope of work performed by Klemens at M&H Gas. Schuff's theory of negligence in part blamed the accident on the negligently mis-labeled electrical relay switch or a mis-wired relay switch connected to the submersible pump in question. Throughout discovery, Schuff sought the simple answer to a simple question: was Klemens involved with this particular electrical work?

¶74 Klemens contends here that there is no evidence to indicate that the inconsistency between its business records and its representations as to the scope of its work was a result of anything other than an "honest mistake."

¶75 The District Court's factual account of the proceedings, however, shows that throughout discovery, Klemens denied that it had performed such work, and downplayed the significance of the work it had performed. Klemens affirmatively led Schuff to believe that its records--written estimates, schedules, time records, invoices, and material sheets-- as well as further testimony by certain expert witnesses substantiated its position. As recited by the court, Klemens claimed in its summary judgment briefs that:

> It is uncontroverted that Kenneco and other electrical contractors did all design, installation and maintenance work on the M&H gasoline pumping system as it was configured at the time of the accident. A.T. Klemens did nothing more [than]

connect the gasoline pumping system as wired to a new electrical service panel for the building. There was nothing wrong with the electrical service panel and it had no involvement in the accident because Mr. Schuff intentionally did not use the breaker panel to cut power to the west pump.

¶76 Klemens also launched repeated objections to Schuff's discovery requests on the grounds that production of its records would be unduly burdensome--and unnecessary in light of the asserted fact that it had had nothing to do with the electrical work implicated by Schuff. Klemens' counsel never directly referenced specific information contained in any of these records in response to discovery, and likewise failed to produce these records at a deposition. Counsel for Klemens would also claim that he never reviewed the documents provided by Klemens, but "rather relied on recollections and representations by Klemens' officers and employees of the work they had done at M&H," according to the District Court. At no time has Klemens adequately explained how providing such simple, routine information of the actual work performed created such a burden that Schuff should have been charged with seeking the information herself.

¶77 Shortly before trial, Schuff discovered that Klemens had, in fact, been involved with substantial work at the station upon a last-minute review of Klemens' records at its counsel's office. The District Court would find that a total of little more than 200 pages of documents revealed this information. The District Court concluded that it was "clear from these documents that Klemens did much more extensive work at M&H than it had claimed in the preceding four years--work which may well have resulted in the miswiring and/or mislabeling of the submersible pump circuits." For example, the court found that the documents revealed that Darrell Anderson--a Klemens employee who had denied having knowledge of any work performed on the wiring of the submersible gas pumps--had performed six-and-a-half hours of such work "relocating the conduit to the submersible pump."

¶78 Explaining why it had avoided disclosing such critical information, Klemens claims that the "inability of Klemens' agents (including its attorney) to correctly recall the scope of work performed at M&H Gas was unfortunate." Unfortunate, indeed, because it is clear from the court's findings and conclusions that had Klemens been forthright in responding to the initial discovery responses in 1993, Schuff could have conducted meaningful follow-up discovery, and this matter could have been resolved--perhaps even settled--long before 1998. Thus, Schuff clearly was prejudiced by Klemens' tactics.

¶79 Apparently, Klemens would have this Court believe that no one took the time to review any of the relevant business records related to the electrical work at M&H Gas during the course of this litigation, which is the only plausible explanation for its collective amnesia. Yet, the review of such records is precisely what Schuff requested of Klemens from the initial stages of discovery forward. This "excusable ignorance" defense cannot be looked upon with anything less than disfavor.

¶80 It is unclear, therefore, how the District Court acted "arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice" in concluding that Klemens should be deemed liable pursuant to Rule 37(d), M. R.Civ.P. *See Eisenmenger*, 264 Mont. at 406, 871 P.2d at 1321 (concluding that failure to completely and directly answer interrogatories, as well as failure to supplement inadequate responses, demonstrated "intolerable gamesmanship and obstructiveness").

¶81 We conclude that the District Court did not ignore "recognized principles resulting in substantial injustice." One recognized principle at stake that should have favored a less severe sanction--the principle of trial on the merits--was curtailed by Klemens' own actions. The record is replete with instances where Klemens willfully and in bad faith shielded Schuff from a clear view of the truth, and simply did not "speak" the truth itself when required by our rules of discovery. Thus, under the criteria identified in *Maloney*, the default judgment clearly relates to the extent and nature of the actual discovery abuse. Second, the record also amply demonstrates that Schuff was prejudiced by the tactics employed by Klemens, which again justifies the severity of the sanction chosen by the court. Finally, given the timing of Schuff's discovery of the concealed information--just days before trial--the District Court was placed in a position where any warning of the consequences would have been meaningless. All three of these factors, in fact, were weighed by the District Court in its written order where it determined that, although harsh, a default as to liability but not damages was warranted under the circumstances.

¶82 Accordingly, we hold that the District Court did not abuse its discretion, and therefore the default judgment sanctioning Klemens for discovery violations pursuant to Rule 37(d), M.R.Civ.P. is affirmed.

### Issue 3.

#### *Does Article II, Section 16, of the Montana Constitution create a fundamental right to recover attorney fees and costs?*

¶83 Following trial, Klemens moved the District Court to alter or amend its judgment to reduce it by the amount collected from collateral sources and the amount paid in settlement by M&H Gas Company and Marley Company, previous codefendants. Schuff objected on the basis that if granted, the offsets claimed would reduce her recovery to less than zero in violation of the right to full legal redress found in Article II, Section 16, of the Montana Constitution.[(6)]

¶84 The District Court held that:

> Therefore, as applied to the case at bar, to the extent that § 27-1-307 and -308 and the offset standard announced in *Deere* will deny Plaintiffs' full legal redress, including recovery of the costs of being made whole, those statutes are constitutionally invalid. However, this Court makes clear that such invalidity is premised on the specific application of the statutes and offset standard to the facts of this case, that is, as against an injured worker, not on a facial invalidity of the statutes. Therefore, Defendant's claims for collateral source reduction and offset must be reduced by the costs of recovery to the Plaintiffs, including attorney fees.

¶85 The District Court based its decision on this Court's decisions in *Trankel v. State Department of Military Affairs* (1997), 282 Mont. 348, 938 P.2d 614; *Francetich v. State Compensation Mut. Ins. Fund* (1992), 252 Mont. 215, 827 P.2d 1279; and *Skauge v. Mountain States Telephone & Telegraph Co.* (1977), 172 Mont. 521, 565 P.2d 628.

¶86 On appeal, Klemens contends that based on *Meech v. Hillhaven West, Inc.* (1989), 238 Mont. 21, 776 P.2d 488, Article II, Section 16, guarantees only those damages recoverable by common law or statutory law and because the law does not provide for recovery of attorney fees in cases of this nature, attorney fees are not part of full legal redress.

¶87 Schuff responds that this Court in *Trankel* held that employees injured during the course of their employment are entitled to full legal redress against third-party tortfeasors and that *Meech* did not define full legal redress but simply addressed whether pursuant to Article II, Section 16, an employee has a right to a particular cause of action. Schuff contends that the measure of full legal redress is the full amount of the jury's verdict and based on decisions in several workers' compensation cases, contends that the cost of recovery must be added to that amount before they have been fully compensated.

¶88 Article II, Section 16, provides as follows:

> Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under the Workmen's Compensation Laws of this state. Right and justice shall be administered without sale, denial, or delay.

¶89 As is more fully discussed in the following section, the *pro tanto* offset of amounts received through settlement as provided for in this Court's decision in *State ex rel. Deere & Co. v. Fifth Judicial District Court* (1986), 224 Mont. 384, 730 P.2d 396, does not deny full compensation for a claimant's losses. It simply assures a single recovery for a single injury. Collateral source offset is based on the same principle. *See* § 27-1-308, MCA. We have previously held that full legal redress need not be satisfied by a single source. *See Brandner v. Travelers Ins. Co.* (1978), 179 Mont. 208, 214, 587 P.2d 933, 937, *overruled on other grounds*, *Francetic v. State Compensation Mut. Ins. Fund* (1992), 252 Mont. 215, 827 P.2d 1279, 1284. The question here is whether the amount of those offsets can be reduced by the amount of the claimant's attorney fees so that in effect the defendant entitled to those offsets is responsible for claimant's fees based on the constitutional guarantee of full legal redress.

¶90 In *Skauge* the plaintiffs' home was destroyed by fire and an explosion and all of their personal possessions destroyed. Their personal possessions were insured for $4000. Their insurance policy granted the insurer the right to subrogate against any third party responsible for the damage. Skauges' actual damage was in the amount of $11,267.32 and they filed a third-party complaint to recover that amount. However, the district court held that Skauges' insurer was entitled to be subrogated to the extent of its payment.

¶91 On appeal we noted that "[s]ubrogation is a device of equity which is designed to compel the ultimate payment of a debt by the one who in justice, equity, and good conscience should pay it." *Skauge*, 172 Mont. at 524, 566 P.2d at 630 (citation omitted). We cited with approval the following language from 16 Couch on Insurance 2d, *Subrogation* § 61.92:

> Subrogation is the substitution of another person in the place of the creditor, so that the person substituted will succeed to the rights of the creditor in relation to the debt or claim, and is an act of the law growing out of the relation of the parties to the original contract of insurance, and the natural justice or equities arising from the fact that the insurer has paid the insured, rather than a right depending upon the contr

*Skauge*, 172 Mont. at 526, 566 P.2d at 630-31.

¶92 We held that the doctrine of legal subrogation is equitable in nature and exists for the purpose of serving the ends of justice:

> [W]hen the insured has sustained a loss in excess of the reimbursement by the insurer, the insured is entitled to be made whole for his entire loss and any costs of recovery, including attorney's fees, before the insurer can assert its right of legal subrogation against the insured or the tortfeasor.

*Skauge*, 172 Mont. at 528, 566 P.2d at 637.

¶93 In *Francetich*, the claimant was injured during the course of his employment and received disability benefits from the State Compensation Mutual Insurance Fund. When he settled a third-party claim arising from the same incident for policy limits, the state fund sought to exercise its subrogation rights pursuant to § 39-71-414(6)(a), MCA. That statute gave the insurer full subrogation rights even though a claimant was able to demonstrate damages in excess of his workers' compensation benefits and third-party recovery combined. Francetich contended that the subrogation statute violated his right to full legal redress guaranteed by Article II, Section 16. This Court agreed. We pointed out that the earlier decision in *Skauge* was based on equitable principles and on the nature of legal subrogation. Francetich, 252 Mont. at 221, 827 P.2d at 1283-84. We cited this Court's discussion of equitable limitations on legal subrogation from *Zacher v. American Ins. Co.* (1990), 243 Mont. 226, 794 P.2d 335, where we observed that the doctrine is based:

> [U]pon an equitable balancing of the rights of the insurer as compared to the claimant. As previously quoted, the basic conclusion is that when the amount recovered by the claimant is less than the claimant's total loss, with the result that either the claimant or the insurer must to some extent go unpaid, then it is equitable that the loss be born by the insurer which had been paid an insurance premium for

the assumption of its liability.

*Zacher*, 243 Mont at 230, 794 P.2d at 338.

¶94 In *Francetich*, the equitable limitation on legal subrogation was no longer available because it had been written out of the law by the terms of § 39-71-414(6)(a), MCA (1987). Therefore, in *Francetich* we held as follows:

> We hold that § 39-71-414(6)(a), MCA is unconstitutional in light of the clear and direct language of Article II, Section 16 of the Montana Constitution. We hold that in a case of reasonably clear liability where a claimant is forced to settle for the limits of an insurance policy which, together with claimant's workers' compensation award, do not grant *full legal redress under general tort law* to the claimant, under workers' compensation laws the insurer is not entitled to subrogation rights under § 39-71-414, MCA.

*Francetich*, 252 Mont. at 224, 827 P.2d at 1285 (emphasis added).

¶95 In *Trankel*, the plaintiff claimed to have been injured due to the negligence of the State of Montana, acting through its Department of Military Affairs while in the course of his employment with the United States Army. However, the District Court held that because Trankel's injuries were incident to his service in the national guard, his claim was barred pursuant to the United State Supreme Court's decision in *Feres v. United States* (1950), 340 U.S. 135, 71 S. Ct. 153, 95 L. Ed. 152, and our prior decision in *Evans v. Montana National Guard* (1986), 223 Mont. 482, 726 P.2d 1160. We reversed the District Court and held that Article II, Section 16, of the Montana Constitution protects an employee's right to recovery of compensation for injuries caused during the course of his or her employment by someone other than the employer or a fellow employee. Referring to our prior decision in *Francetich*, we held that:

> We reaffirm that pursuant to the second sentence in Article II, Section 16, of the Montana Constitution, any statute or court decision which deprives an employee of his right to full legal redress, *as defined by the general tort law of this state against third parties*, is absolutely prohibited. That sentence is mandatory and self-executing, and leaves no room for erosion based on what federal courts or the courts of other states would do pursuant to federal laws or the laws of other states.

*Trankel*, 282 Mont. at 362, 938 P.2d at 623.

¶96 We conclude that the right to full legal redress guaranteed by our decision in *Trankel* is limited to the recovery of those damages provided by the general tort law and that pursuant to the American Rule, attorney fees are not damages recoverable pursuant to the general tort law as it pertains to survival and wrongful death actions. We furthermore conclude that *Skauge* and its progeny which include the costs of recovery in the concept of full compensation relate to equitable principles unique to the law of legal subrogation and are inapplicable to the constitutional issue of whether full legal redress as guaranteed by Article II, Section 16, of the Montana Constitution requires payment of attorney fees. In fact, we have previously distinguished *Skauge* where the party claiming a right to offset is not an insurer which had been paid premiums to assume the risk of loss. *See Thayer v. Uninsured Employers Fund*, 1999 MT 304, ¶ 21, 297 Mont. 179, ¶ 21, 991 P.2d 447, ¶ 21.

¶97 Montana's common law has followed the American Rule that attorney fees are not an element of damages unless expressly provided for by statute or contract. *See Hickingbotham v. Duncan* (1995), 271 Mont. 525, 531, 898 P.2d 1215, 1219; *Ehly v. Cady* (1984), 212 Mont. 82, 687 P.2d 687. The United Supreme Court has held that: "[T]he argument that attorneys' fees must be added to a plaintiff's recovery if the award is truly to make him whole is contrary to the generally applicable American Rule." *Norfolk & Western Ry. Co. v. Liepelt* (1980), 444 U.S. 490, 495, 100 S. Ct. 755, 758, 62 L. Ed. 2d 689.

¶98 On the other hand, those damages recoverable in a survival or wrongful death action based on the general tort law of Montana were summarized in *Swanson v. Champion Int'l Corp.* (1982), 197 Mont. 509, 646 P.2d 1166. There we held that:

> The damages that may be recovered in the survival cause of action for the death of the decedent through tort include his lost earnings from the time of his injury to his death; the present value of his reasonable earnings during his life expectancy; the medical and funeral expenses incurred by him as a result of the tort; reasonable compensation for his pain and suffering, and other special damages.

*Swanson*, 197 Mont. at 515, 646 P.2d at 1169 (citations omitted).

¶99 We held that in wrongful death actions:

> Generally the proof of damages under this cause of action will include loss of consortium by a spouse . . . the loss of comfort and society of the decedent suffered by the surviving heirs; and the reasonable value of the contributions in money that the decedent would reasonably have made for the support, education, training, and care of the heirs during the respective life expectancies of the decedent and the survivors.

*Swanson*, 197 Mont. at 517, 646 P.2d at 1170 (citation omitted).

¶ 100 Schuff contends that because the jury awarded damages in the amount of $1,303,000 that is the measure of full legal redress and if she is required to deduct attorney fees from that amount, she will be denied full legal redress. While it is true that following proper instructions regarding the damages recoverable at law a jury's verdict is the measure of full legal redress, it does not follow that a party required to pay attorney fees from that amount is denied full legal redress. As pointed out, attorney fees are not an element of damage. They are the subject of contract between a party and his or her attorney. *Brytus v. Spang & Co.* (3d Cir. 2000), 203 F.3d 238, 241. They are what a party chooses to do with his or her recovery after it is received based upon a prior arrangement. While the practical effect may be that Schuff recovers less than the full amount of her actual damages, she has not been denied something she is entitled to recover against third parties based on "the general tort law of this state."

¶101For these reasons, we conclude that Article II, Section 16, of the Montana Constitution does not create a fundamental right to recover attorney fees. Therefore, we conclude that the District Court erred when it held that Klemens' right to offset for collateral source payments and contributions from joint tortfeasors is reduced by the amount of fees incurred by Schuff.

## Issue 4.

### Did the District Court err when it reduced the jury verdict pro tanto based on Schuff's prior settlement with the other named defendants?

¶102 On cross-appeal, Schuff argues that, aside from the constitutional question, the District Court erred when it offset the jury award by the amount she received in settlement with the other named defendants. Schuff primarily focusses on the equitable nature of such a "*pro tanto*" offset, and argues that under the specific facts of this case, Klemens is not

entitled to any equitable reduction of the jury award entered against it. We disagree.

¶103 The District Court determined that Klemens was entitled to a *pro tanto* offset of the amounts Schuff received through her settlement, pursuant to this Court's decision in *State ex rel. Deere v. District Court* (1986), 224 Mont. 384, 730 P.2d 396, *superseded in part by statute as provided in Plumb v. Fourth Jud. Dist. Court* (1996), 279 Mont. 363, 927 P.2d 1011. In that case, which similarly involved multiple defendants, we held that an award entered against "remaining tortfeasors is to be reduced by a dollar credit in the amount of consideration paid by the settling tortfeasor . . ." *Deere*, 224 Mont. at 286, 730 P.2d at 398. Thus, the District Court--notwithstanding any adjustment for attorney's fees--effectively reduced Schuff's jury verdict by the undisclosed sum received in settlement with the other defendants.

¶104 The principle of *pro tanto* reduction provides that "when a joint tort-feasor settles with a claimant, the claimant's recovery against the remaining tort-feasor is to be reduced dollar-for-dollar by the consideration paid by the settling tort-feasor." *Boyken v. Steele* (1993), 256 Mont. 419, 421, 847 P.2d 282, 284 (citations omitted). The *pro tanto* rule applies only if two or more concurrent or joint tortfeasors cause a single "indivisible" harm. *See Jim's Excavating Serv., Inc. v. HKM Associates* (1994), 265 Mont. 494, 514, 878 P.2d 248, 260; *Azure v. City of Billings* (1979), 182 Mont. 234, 248, 596 P.2d 460, 468 (concluding that a *pro tanto* deduction is not allowed where the plaintiff's injuries are divisible).

¶105 Schuff does not argue that the settling defendants and Klemens did not cause a single "indivisible" harm. Nor does she argue, as a matter of equity, that Klemens will not be paying its fair share of the damages once the jury award is reduced by the amount of the settlement. *See*, *e.g.*, *Roland v. Bernstein* (Ariz.Ct.App. 1991), 828 P.2d 1237, 1239 (stating that a rule allowing a non-settling tortfeasor to escape liability by reason of "the faulty assessment of probabilities by a settling tortfeasor" might discourage settlement by the last tortfeasor, and these considerations have lead most courts considering the question to apply the rule disallowing reduction for settlements). Rather, she emphatically argues that, as an equitable doctrine, it would be inappropriate to grant Klemens' claim for *pro tanto* reduction in view of the default judgment entered against it for its discovery violations. In other words, the default judgment entered against Klemens was not punishment enough. Schuff's authority for this proposition is tenuous, at best, and ignores the underlying principle of the *pro tanto*, or "dollar-for-dollar" award reduction--that an injured party is entitled to but a single satisfaction for a single injury. *See Maddux v.*

*Bunch* (1990), 241 Mont. 61, 67, 784 P.2d 936, 940.

¶106 Accordingly, we hold that the District Court did not err when it reduced Schuff's jury verdict award by the amount received prior to trial in settlement with the other named defendants.

## *Issue 5.*

### *Did the District Court err in its collateral source reduction determinations regarding workers' compensation and Social Security benefits?*

¶107 Klemens argues that the District Court erred when it ruled that the workers' compensation death benefits and Social Security survivor benefits received by Schuff as a result of her husband's death could not be used to offset the jury verdict award pursuant to Montana's collateral source statutes. In turn, Schuff argues that the court similarly erred when it determined that her receipt of medical and funeral expenses from a workers' compensation insurance carrier was a collateral source, and therefore erred when it deducted $203,000, less a $55,000 subrogation settlement, from the jury verdict.

¶108 Pursuant to § 27-1-308, MCA, in "an action arising from bodily injury or death when the total award against all defendants is in excess of $50,000 and the plaintiff will be fully compensated for his damages, exclusive of court costs and attorney fees, a plaintiff's recovery must be reduced by any amount paid or payable from *a collateral source that does not have a subrogation right*." (Emphasis added). Thus, as a threshold determination, if the collateral source at issue possesses a subrogation right, the collateral source reduction statutes do not apply.

¶109 Under § 39-71-414, MCA, a workers' compensation insurer "is entitled to subrogation for all compensation and benefits paid or to be paid under the Workers' Compensation Act." This statutory right of subrogation prevents workers' compensation benefit payments from being deducted from a judgment as a collateral source, pursuant to § 27-1-308, MCA. Accordingly, we hold that the District Court correctly excluded the "continuing" workers' compensation death benefits from its application of § 27-1-308, MCA.

¶110 On the other hand, we hold that the District Court erred when it deducted the $203,000 workers' compensation medical and funeral expense payments, less the

subrogation settlement of $55,000, from the jury verdict pursuant to § 27-1-308, MCA. We further hold that it is immaterial whether the workers' compensation insurer in this instance, at some point, reached a settlement agreement with Schuff regarding its right of subrogation. We conclude that *how* a workers' compensation carrier exploits its statutory subrogation right does not materially affect the fact that it possesses such a right as a matter of law.

¶111 Social Security survivor benefits, however, carry no subrogation rights to tort injury awards. *See generally Richardson v. Belcher* (1971 ), 404 U.S. 78, 81-86, 92 S.Ct. 254, 257-60, 30 L.Ed.2d 231 (stating that Social Security benefits would not be reduced following injured worker's receipt of proceeds from a tort action); 42 U.S.C § 424(a) (providing for reduction by federal government of Social Security disability benefits to offset state workers' compensation recoveries).

¶112 Therefore, we next turn to § 27-1-307, MCA, which provides the definitions for § 27-1-308, MCA, to determine whether the payment of Social Security survivor benefits has been identified by the Legislature as a collateral source that must be deducted from a plaintiff's award for damages.

¶113 Under subsection (1), a collateral source is generally defined as "a payment for something that is later included in a tort award and that is made to or for the benefit of a plaintiff or is otherwise available to the plaintiff." Here, Schuff's damage award for her husband's wrongful death specifically included $600,000 for "lost earnings of the deceased." It is well-settled that Social Security survivor benefits are intended to compensate for a decedent's lost earnings, and therefore qualify, under subsection (1), as a potential collateral source. *See*, *e.g.*, *Bryant v. New York City Health & Hosps. Corp.* (N. Y. 1998), 716 N.E.2d 1084, 1092. Our inquiry does not end there, however.

¶114 We must next turn to the subparts of subsection (1), under § 27-1-307, MCA, where the Legislature has specifically identified the kinds of payments that must be deducted as a collateral source under the directives of § 27-1-308, MCA. Accordingly, in the absence of such clear introductory terms as "for example" or "including but not limited to" or "may include," the plain meaning of the statute is that if a potential collateral source is not identified in these subparts, it is not subject to reduction under § 27-1-308, MCA.

¶115 At this juncture in our review, it is critical to again emphasize that in construing a statute, "the office of the judge is simply to ascertain and declare what is in terms or in

substance contained therein, not to insert what has been omitted or to omit what has been inserted." *See* § 1-2-101, MCA; *McClure v. State Compensation Ins. Fund* (1995), 272 Mont. 94, 98, 899 P.2d 1093, 1096. Furthermore, another rule of statutory construction is that those statutes that limit a party's remedy must be strictly construed. *See*, *e.g.*, *Abbott Laboratories v. Portland Retail Druggists Ass'n, Inc.* (1976), 425 U.S. 1, 11, 96 S.Ct. 1305, 1313, 47 L.Ed.2d 537. It is beyond discussion that the collateral source reduction statutes at issue here serve to limit a party's recovery for damages, as provided pursuant to §§ 27-1-202 and 203, MCA.

¶116 Therefore, we began our review of § 27-1-307, MCA, by simply reading the statute. To aid our reading, this Court frequently turns to familiar maxims or canons of statutory construction, including but not limited to: *ejusdem generis* (general words will be construed according to more specific and particular preceding words); *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another), and "a particular intent will control a general one that is inconsistent with it." *See* Black's Law Dictionary at 517 and 581 (6th ed. 1990), and § 1-2-102, MCA. These well-observed rules are followed routinely by this Court. The cases are legion. *See*, *e.g.*, *Walter v. Board of R.R. Comm'rs* (1969), 153 Mont. 384, 387-89, 457 P.2d 479, 481-82 (concluding that the term "commodities" was limited by the preceding terms "heavy equipment, tractors, power shovels" and could not be construed to include "petroleum"); *Mitchell v. University of Montana* (1989), 240 Mont. 261, 264-65, 783 P.2d 1337, 1339-40 (concluding that term "local governmental entity" did not include "board of regents"); *In re Marriage of Jones* (1987), 226 Mont. 14, 736 P.2d 94 (concluding that statute specifically addressing venue for marriage dissolution controlled other more general venue provisions).

¶117 Turning our attention back to the statute at issue, the subparts in their entirety under § 27-1-307(1), MCA, are as follows:

> (a) for medical expenses and disability payments under the federal Social Security Act, any federal, state, or local income disability act, or any other public program;
>
> (b) under any health, sickness, or income disability insurance or automobile accident insurance that provides health benefits or income disability coverage, and any other similar insurance benefits available to the plaintiff, except life insurance;
>
> (c) under any contract or agreement of any person, group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical,

dental, or other health care services, except gifts or gratuitous contributions or assistance;

(d) any contractual or voluntary wage continuation plan provided by an employer or other system intended to provide wages during a period of disability; and

(e) any other source, except the assets of the plaintiff or of the plaintiff's immediate family if the plaintiff is obligated to repay a member of the plaintiff's immediate family.

¶118 The District Court determined, under a plain-meaning analysis, that the Social Security survivor benefits received by Schuff and her children were neither a "medical expense" nor a "disability payment" under subpart (a) and therefore were not identified under the statute as a collateral source that must be deducted from Schuff's wrongful death recovery pursuant to § 27-1-308, MCA. We agree.

¶119 Social Security benefits, as a potential collateral source under subsection (1) of § 27-1-307, MCA, are specifically addressed under subpart (a), which requires that to be deemed a collateral source, the payment received by the plaintiff must be "for medical expenses and disability payments." Among the named sources of these "medical expenses and disability payments" is the federal Social Security Act. The subpart also, more generally, identifies any other "federal, state, or local income disability act, or any other public program" as a source for these two kinds of payments.

¶120 First, Klemens does not argue that the collateral statute is, as a whole or in part, ambiguous. Therefore, we need not turn to legislative history for guidance; rather, the legislative intent of § 27-1-307, MCA, must be gleaned from the plain meaning of the language as set forth by the Legislature in the statute. *See Smart v. Montana Historical Soc.* (1996), 277 Mont. 89, 94-95, 918 P.2d 670, 674 (citations omitted). Thus, because the issue of ambiguity was not raised, our task pursuant to § 1-2-101, MCA, does not include speculation concerning whether a particular term or provision was a product of oversight or poor draftsmanship. *See generally Wentz v. Montana Power Co.* (1996), 280 Mont. 14, 20, 928 P.2d 237, 241; *American Linen Supply Co. v. Department of Revenue* (1980), 189 Mont. 542, 545, 617 P.2d 131, 133.

¶121 Under a plain-meaning interpretation of § 27-1-307(1)(a), MCA, Schuff and her children are not receiving "disability" benefits from Social Security because either she or

her husband are disabled, and therefore unable to work. *See* 42 U.S.C. § 423. Rather, she and her children are receiving "survivor" benefits, due to the sudden and tragic loss of her husband's life, which are identified under an entirely different section of the Social Security Act, and funded by an entirely different source. *See* 42 U.S.C. § 402. *See generally Mathews v. de Castro* (1976), 429 U.S. 181, 185-86, 97 S.Ct. 431, 434, 50 L. Ed.2d 389; *Smith v. Board of Trustees* (N.C.Ct.App. 1996), 471 S.E.2d 121, 123. The same analysis obviously applies to the statute's reference to "medical expenses." Again, as written, subpart (a) identifies two distinct kinds of Social Security payments that must be deducted from a plaintiff's judgment, both of which by definition do not include Schuff's receipt of Social Security payments for survivor benefits.

¶122 In the context of § 27-1-307, MCA, entitled "Definitions," if the Legislature had truly wished to characterize any and all kinds of Social Security payments as a collateral source, rather than just the two specific kinds, it could have easily said so--and, under our rules, plainly chose to remain silent. Therefore, because the Legislature specifically included these terms, a court should properly exclude all other kinds of Social Security as collateral sources in construing the statute as a whole--i.e., the expression of these specific kinds of Social Security payments in subpart (1)(a) excludes other types of Social Security payments not mentioned (*expressio unius est exclusio alterius*).

¶123 Klemens argues that any distinction that might be drawn between "disability" and "survivorship" benefits is "irrelevant for purposes of MCA § 27-1-307(1)(a)" and that the reference to the more general term "any other public program" under subpart (a) was obviously intended to include Schuff's Social Security survivor benefits. Klemens has failed, however, to cite any authority that supports such an approach to statutory construction. Moreover, as we have already noted, general words will be construed according to more specific and particular preceding words (*ejusdem generis*). Accordingly, the general phrase "any other public program" is construed--and limited--by the more specific reference to "medical expenses and disability payments."

¶124 The application of the foregoing rules to our interpretation of § 27-1-307(1)(a), MCA, also applies to Klemens' contention that subpart (e) under § 27-1-307, MCA, should be construed to include all other unnamed kinds of Social Security benefits. We find little merit in this argument as well.

¶125 Subpart (e) provides that in addition to the specific kinds of sources identified in subparts (a) through (d), "any other source except the assets of the plaintiff" should qualify

as a collateral source deduction. According to Klemens, subpart (e) should include the "other source"--the payment of Social Security survivor benefits. This interpretation would effectively repeal subpart (a) as to Social Security payments or render that subpart meaningless surplusage. Such an interpretation invokes yet another rule of statutory construction: The legislature does not perform useless acts. *See American Linen Supply Co.*, 189 Mont. at 545, 617 P.2d at 133. Hence, if we were to rule that the general language of part (1) and subpart (1)(e) controls the specific language of (1)(a) through (d), contrary to our well-settled rules of statutory construction and our case law, we would upset the very legislative scheme that the Legislature chose to enact by its enumeration of these specific kinds of collateral source payments.

¶126 Again, if the Legislature had truly wished that a collateral source be any other possible source "except the assets of the plaintiff," then it could have easily said so--and simply could have omitted the carefully detailed subparts (a) through (d). Accordingly, we hold that the plain meaning of "any other source" under subpart (e) means just what it says: any source *other* than those identified and addressed in subparts (a) through (d), which would obviously exclude Social Security, under subpart (a).

¶127 We conclude, therefore, that the District Court did not err when it determined that Schuff's Social Security benefits were not a collateral source identified under § 27-1-307, MCA, and should not be deducted from the jury award.

¶128 In summary, we hold that the District Court did not err when it determined that Schuff's receipt of workers' compensation death benefits and Social Security survivor benefits were not collateral sources that could be deducted from the jury verdict award. We further hold that the District Court erred, however, when it concluded that Schuff's receipt of $203,000 in workers' compensation medical and funeral expense payments was a collateral source that could be deducted from the jury verdict award.

## Issue 6.

### *Did the District Court err when it limited Schuff's recovery of prejudgment interest?*

¶129 The District Court denied Schuff's post-judgment motion for prejudgment interest on her $203,000 jury award for medical and funeral expenses. The court concluded that Schuff had already received compensation for these expenses from workers'

compensation--a sum which in turn would serve as a collateral source reduction--and therefore the statute governing the recovery of prejudgment interest was inapplicable. In other words, Schuff could not collect interest on a damage award that she would never actually receive due to what amounted to a dollar-for-dollar offset.

¶130 Under § 27-1-210, MCA, "a prevailing claimant is entitled to interest at a rate of 10 percent on any claim for damages awarded that are capable of being made certain by calculation, beginning from the date 30 days after the claimant presented a written statement to the opposing party or his agent stating the claim and how the specific sum was calculated."

¶131 Schuff contends that the application of the foregoing to the factual scenario of her cause is straightforward. She provided the opposing party here with written notice of the claim for medical and funeral expenses in 1993, at slightly more than $200,000, and this specific claim in turn was awarded by the jury. It is undisputed that the jury awarded Schuff $203,000 for medical and funeral expenses. *See generally Jim's Excavating Serv., Inc. v. HKM Associates* (1994), 265 Mont. 494, 516, 878 P.2d 248, 261 (concluding that damages are not capable of being made certain by calculation where "claimant alleges an award which is substantially different from the amount ultimately awarded by the trial court") (citations omitted).

¶132 Schuff's contention, however, relies on this Court's reversal of the District Court's collateral source reduction ruling. Therefore, because we have reversed the District Court's collateral source reduction ruling, specifically the $203,000 medical and funeral expenses received from workers' compensation, we likewise reverse the court's denial of Schuff's request for prejudgment interest on that sum.

### Issue 7.

#### *Did the District Court err in determining the proper date for post-judgment interest?*

¶133 Finally, Schuff argues that the District Court erred when it ruled that judgment interest should run from the date of the amended judgment on January 4, 1999, rather than from the date of the original judgment on October 30, 1998. Klemens conceded this issue both in its brief and at oral argument. Because this issue is no longer in dispute, we therefore need not address this issue on appeal. *See generally State v. Keys*, 1999 MT 10, ¶

20, 293 Mont. 81, ¶ 20, 973 P.2d 812, ¶ 20; *Doting v. Trunk* (1992), 253 Mont. 350, 360, 833 P.2d 1028, 1035.

## CONCLUSION

¶134 In summary, we (1) affirm the District Court's denial of Klemens' motion to disqualify the Marra firm from representing Schuff; (2) affirm the court's entry of a default judgment on liability in favor of Schuff as a sanction for Klemens' discovery violations; (3) reverse the court's award of attorney's fees and costs based on its "full legal redress" analysis pursuant to Article II, Section 16, of the Montana Constitution; (4) affirm the court's offset of the jury award based on Schuff's prior settlement with the other named defendants; (5) affirm the court's ruling that workers' compensation death benefits and Social Security survivor benefits are not collateral sources subject to a statutorily-mandated offset; (6) reverse the court's ruling that Schuff's receipt of workers' compensation medical and funeral expenses constituted a collateral source; (7) reverse the court's denial of prejudgment interest accruing to the jury's award of medical and funeral expenses; and, finally, (8) reverse the judgment interest date fixed by the court in its Order amending the judgment.

¶135 Accordingly, this matter is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ TERRY N. TRIEWEILER

Justice Karla M. Gray, concurring in part and dissenting in part.

¶136 I concur in the Court's opinion on all issues except the second portion of issue 5 and issue 2. With regard to that portion of issue 5 relating to Social Security benefits, I join in Judge Harkin's special concurrence and dissent. With regard to issue 2, whether the District Court abused its discretion in entering a default judgment on liability against Klemens as a sanction for alleged discovery abuses, I concur in the result the Court reaches but I do not agree entirely with the Court's analysis or all that is said therein.

¶137 With regard to default judgments as sanctions for discovery abuses pursuant to Rule 37(d), M.R.Civ.P., I agree with the Court that the trial judge generally is in the best position to know when a party callously disregards the rights of its opponent and to determine which sanction is the most appropriate. I also agree wholeheartedly that discovery abuse must no longer be dealt with leniently and that transgressors should be punished rather than repeatedly encouraged to cooperate.

¶138 These agreements, however, do not change my view that the Court's discussion and analysis of the sanction issue is flawed. In my view, the Court should first resolve the threshold question inherent in this important issue. That question, simply stated, is whether the District Court's determination that there were "no less than four direct discovery violations . . . falling under Rule 37(d) M.R.Civ.P." is correct. Only by doing so do we give guidance to the district courts and legal practitioners; and only after doing so can we review the default judgment under the appropriate standard of review.

¶139 The Montana Rules of Civil Procedure provide the authority for a district court to impose sanctions for discovery abuses. Rule 37(b), M.R.Civ.P., authorizes sanctions for failure to comply with a court order compelling discovery; the available sanctions are set forth in paragraphs (A), (B), and (C) of that rule and include "rendering a judgment of default against the disobedient party[.]" *Jerome v. Pardis* (1989), 240 Mont. 187, 191, 783 P.2d 919, 921 (citation omitted). Rule 37(d), on the other hand, provides for the imposition of the same range of sanctions for a failure:

> (1) to appear before the officer who is to take the deposition, after being served with a proper notice, or (2) to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, or (3) to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request[.]

Read together, the important distinction between Rule 37(b) and Rule 37(d) is that sanctions are not available under subsection (b) without a previous court order, while sanctions are available under subsection (d) without a previous order but only for the three enumerated failures. *Jerome*, 240 Mont. at 191, 783 P.2d at 921 (citations omitted).

¶140 Against this backdrop, then, I turn to the District Court's determination that Klemens' discovery-related conduct in this case resulted in "no less than four direct discovery

violations" under Rule 37(d), M.R.Civ.P. As set forth above and pursuant to both Rule 37 (d) and *Jerome*, discovery-related sanctions can be imposed under subsection (d) only if the discovery actions or inactions fall within the three enumerated violations stated therein. Klemens' Rule 37(d) violations, as determined by the District Court, are (1) "failure to give accurate answers to Interrogatories[;]" (2) "failure to provide the key documents at deposition[;]" (3) "failure of defendant's agents, including their electrical manager who actually performed some of the critical work, to disclose [certain] facts at deposition[;]" and (4) "failure to provide two key witnesses [for] deposition, including one who also performed critical work."

¶141 After close scrutiny of the record before us, and stated only briefly, I would conclude that the District Court's first determination is correct under *Eisenmenger*, where we made it clear that a complete failure to respond to interrogatories is not required before sanctions are allowed under Rule 37(d). With regard to the District Court's other determinations of "direct discovery violations" under Rule 37(d), I would conclude that the District Court erred. In my view, those instances of Klemens' conduct do not fall within the violations specifically enumerated in Rule 37(d) as proper foundations for sanctions for discovery abuse. In summary, the District Court was authorized under Rule 37(d) to impose sanctions in this case as a result of Klemens' one Rule 37(d) violation and the remaining issue is whether the sanction imposed--default judgment on liability--was justified. In my opinion, the matters the District Court erroneously determined to be violations of Rule 37 (d) are relevant in resolving this remaining question.

¶142 In reviewing the propriety of the sanction, it is my view the "abuse of discretion" test set forth in *Eisenmenger*--rather than the three-factor test from *Maloney* set forth by the Court but never applied--is the proper standard of review in cases such as *Eisenmenger* and the present case involving Rule 37(d) violations. The *Maloney* test, taken from *Smith,* is appropriate in cases like those, which involve Rule 37(b) violations. Applying the third *Maloney* factor--whether the court expressly warned the allegedly abusive party of the consequences--makes good sense in the Rule 37(b) situations which generally involve motions to compel, court orders requiring certain discovery, repeated violations of court orders and the like. Those are the situations in which an express warning of coming consequences could, and would, as a practical matter, be given. That factor makes little or no sense in the Rule 37(d) context where sanctions are available without a previous court order but only for the enumerated violations and where "[n]o second chance is contemplated." *Jerome*, 240 Mont. at 191, 783 P.2d at 921. I fail to comprehend how Rule 37(d) discovery sanction situations provide any reasonable opportunity for the trial court

to "expressly warn" of coming consequences.

¶143 Under the abuse of discretion standard, our strong commitment to the principle that the trial judge generally is in the best position to determine which sanction is appropriate, and the complete record before us including the matters of importance referenced by the District Court but, in my view, not constituting Rule 37(d) violations, I join the Court in concluding that the District Court did not abuse its discretion in imposing the sanction of default judgment on liability against Klemens.

/S/ KARLA M. GRAY

Judge Douglas G. Harkin, concurring in part and dissenting in part.

¶144 I concur with the Court's analysis and decision as to Issues 1, 2, 3, 4, 6 and 7. I concur with the Court's analysis and decision as to Issue 5, except I do not agree with that part of the analysis which resolves the Social Security survivor benefits matter by application of the canon of construction *expresio unius est exclusio alterius.*

/S/ DOUGLAS G. HARKIN

District Judge, Sitting for Justice Jim Regnier

Judge G. Todd Baugh, concurring in part and dissenting in part.

¶145 I dissent from the majority's analysis and decision as to that part of Issue 5 dealing with Social Security survivor benefits, and I dissent from the majority's analysis and decision as to that part of Issue 6 pertaining to prejudgment interest on the jury's award of medical and funeral expenses. I concur with the Court's decision and analysis as to all other Issues.

¶146 As to Issue 5, the majority concludes that Social Security death benefits are not a collateral source. Collateral sources are defined at § 27-1-307(1), MCA. It is an all-inclusive definition. Anything can be a collateral source.

¶147 The subparts to § 27-1-307(1), MCA, follow a colon that ends part (1) which means that the following subparts are examples, explanations and illustrations. (Look it up in the back of your dictionary or consult your favorite grammar person.) As a list of examples, explanations and illustrations, the list is not all-inclusive except for "any other source..." in

subpart (e). The only substantive part of the subparts are the exceptions.

¶148 The majority says that something that is not in the statute in so many words, to-wit: Social Security death benefits, is, nonetheless, an exception to the broad definition of collateral source defined in part (1). They do this by application of two of the canons of construction: primarily, *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) applied to subpart (a), and secondarily, *ejusdem generis*, applied to subparts (a-e).

¶149 In general, the canons of construction are not without criticism. *See* Richard A. Posner, *Statutory Interpretation--In the Classroom and in the Courtroom,* 50 U.Chi.L.Rev. 800 (1983). Judge Posner argues that many courts put too much emphasis on and otherwise misuse these canons.

¶150 To apply *expressio unius est exclusio alterius* one must conclude that a complete statement or list would have normally included that which was omitted. Only then does it follow that the omission is arguably significant. *Ford v. U.S.* (1927), 273 U.S. 593, 611-12; 47 S.Ct. 531, 537, 71 L.Ed. 793.

¶151 Subpart (a) references medical and disability payments as an example of or, as the majority see it, a part of the definition of, collateral source. If one emphasizes the adjective "federal Social Security Act" rather than the predicate of subpart (a), then subpart (a) references federal Social Security Act medical and disability payments. Obviously, the legislature could have expanded subpart (a) to include Social Security death benefits.

¶152 Is Social Security death benefits so closely related to Social Security medical and disability payments that it must necessarily follow that the omission of Social Security death benefits was purposely omitted by the legislature? The majority answer this question in the affirmative. I believe the majority reads too much into the omission and misapplies the canon in question.

¶153 In subpart (b) is a discussion of insurance that is a collateral source--either an example of collateral source or, as the majority see it, part of the definition of collateral source. Also in subpart (b) an exception is made so that life insurance is excluded as a collateral source.

¶154 If *expressio unius est exclusio alterius* has application in construing § 27-1-307,

MCA, it would seem that this canon might as well apply here at subpart (b) because Social Security death benefits have as much, or more, in common with life insurance as with medical and disability payments. So, if the canon were applied here, the omission of Social Security death benefits as an exception to the definition of collateral source, one would conclude by application of this canon that Social Security death benefits are a collateral source.

¶155 At best, it is a draw and this canon offers no assistance in interpretation of § 27-1-307, MCA.

¶156 Is *ejusdem generis* of any more assistance? This canon (of the same kind, class or nature) is an illustration of *noscitur a sociis,* general and specific words are associated with and take color from each other, restricting general words to a sense analogous to less general words. *Black's Law Dictionary.*

¶157 Apparently, the majority or at least some of them, see subparts (a-e) as a list of specific and general phrases, discussion, definitions or whatever and conclude that the general "any other source" part of subpart (e) is limited to the less general or specifics of subparts (a-d). This seems to me a strained application of the maxim or canon of construction. Further, this interpretation effectively eliminates "any other source" from the statute all together.

¶158 The majority may be right in their interpretation. The Legislature may have intended that Social Security death benefits are not to be a collateral source. However, the Legislature did not say that and any amount of construction, rationalization, bending or manipulation will not make it so.

¶159 The object is to make a plaintiff whole for his damages caused by a defendant. On the other hand, it is not the object to make the plaintiff more than whole. The jury in this case determined the amount necessary to make the Plaintiff whole: 1.3 million dollars.

¶160 Unlike life insurance (an exception to collateral source) which one purchases with his own money or earns as part of his employment package, Social Security death benefits are part of the fabric of society paid for by all citizens, including the Plaintiff and the Defendant.

¶161 Since the District Court did not include Social Security death benefits as a collateral

source, it erred and so do we by not setting this right at this time. The majority will make Plaintiff some $247,070 more than whole. By not simply applying the foremost canon of judicial construction, to-wit: read the statute, the majority does not apply the law as written by the Legislature and will in this case and countless others, enable some plaintiffs to be made more than whole at the unjust expense of those committing unintended torts. If the statute is to be rewritten to include language that the Legislature left out, then it is the Legislature's task, not this Court's to accomplish that.

¶162 As to Issue 6, the majority will also give Plaintiff prejudgment interest on the basis that it is calculable as to at least the $203,000, in medical and funeral expenses awarded by the jury. The Plaintiff made a demand of Defendant for this long before trial.

¶163 However, I believe the record reflects that even before Plaintiff's demand, the State Fund had paid these things. At some point before trial and after Plaintiff had settled with some other Defendants, Plaintiff was able to settle the State Fund's subrogation rights for $55,000. Plaintiff certainly cannot be faulted for settling a claim for 25 cents on the dollar and is certainly entitled to the benefit of the bargain.

¶164 Inherent in the concept of interest is that the purpose of interest is to compensate for the use or detention of money. In the case at bar, the medical and funeral expenses were paid by the State Fund. Plaintiff accepted the benefit of those payments and has waived all claims to prejudgment interest. *See* § 27-1-214, MCA.

¶165 Then, Plaintiff paid the State Fund $55,000 to settle the subrogation claim. All Plaintiff is out, that Plaintiff was entitled to from Defendant prior to trial, was $55,000 from the date Plaintiff settled the subrogation claim. Plaintiff's prejudgment interest should be based on the $55,000 Plaintiff lost the use of before trial.

¶166 To the extent the majority will allow Plaintiff prejudgment interest on more than the $55,000 for a longer period than from the date Plaintiff paid the $55,000, I dissent.

/S/ G. TODD BAUGH

District Judge sitting for Justice William E. Hunt, Sr.

Judge Gary L. Day, dissenting.

¶167 I dissent from the majority's decision and analysis as to Issue 1. Since I would

remand for a new trial, I do not reach the remaining issues on appeal.

¶168 With regard to issue 1, whether the District Court abused its discretion when it denied Klemens' motion to disqualify the Marra firm from representing Schuff, I respectfully dissent from the Court's opinion. I would hold that the District Court did abuse its discretion, and I would remand for trial with different counsel representing Schuff.

¶169 The Second Circuit in *Cinema 5 Ltd. v. Cinerama, Inc.* (2d Cir. 1976), 528 F.2d 1384, stated that a lawyer who would sue his or her own client, asserting in justification the lack of "substantial relationship" between the litigation and the work he or she has undertaken to perform for that client, is "leaning on a slender reed indeed." *Cinema 5 Ltd.*, 528 F.2d at 1386. This slender reed now also has the majority camped on its edges.

¶170 I agree with the majority that the Supreme Court has original and exclusive jurisdiction in all matters involving discipline of attorneys practicing law in this state. However, there is no issue regarding discipline of attorneys before this Court. The issue before the Court is whether the Marra firm should have been allowed to continue to represent the Plaintiff in this matter given the fact that it had, as a current client, the Defendant. District courts commonly issue orders that govern the conduct of attorneys in regards to particular litigation (e.g., contempt and discovery sanctions). These orders are under the district court's inherent power to control litigation and to provide for fairness and justice and an orderly conduct of the proceedings. *See* § 3-1-111, MCA. *See also* Felix F. Stumpf, *Inherent Powers of the Courts: Sword and Shield of the Judiciary*, at 24-35 (1994). An order concerning disqualification is also within the discretion and authority of the district court.

¶171 In its discussion of the background of Montana's Rules of Professional Conduct the majority indicates that the argument of Appellant raises two "inevitable" questions, the first being whether an alleged rule violation can be determined, as a matter of law, by a district court and secondly, if so, what effect does a proven violation have in an underlying civil proceeding. I disagree with the first part of this analysis. The issue before this Court is not whether the District Court erred in finding no *rule* violation concerning disqualification, but rather whether the District Court erred in finding that no disqualification of the Marra firm was necessary under the facts.

¶172 The majority cites *Carlson v. Morton* (1987), 229 Mont. 234, 745 P.2d 1133, to

support its position that a district court cannot consider a Rules of Professional Conduct violation because such a violation is the exclusive jurisdiction of the Court. The *Carlson* case should be limited to its facts. In *Carlson* the issue had to do with legal malpractice. The Plaintiff in that case failed to identify or call an expert witness to support his allegation that legal malpractice had occurred. Instead of naming an expert, the Plaintiff asserted the Defendant had violated various Disciplinary Rules of the Code of Professional Responsibility (replaced by the current Rules of Professional Conduct in 1985). The District Court ruled that charges of legal malpractice required expert testimony to delineate the degree of care expected of an attorney handling a client's affairs. The Supreme Court agreed and said that an expert is necessary to prove legal malpractice and it was not sufficient to rely on alleged violations of the Code of Professional Responsibility. *See generally Carlson*, 229 Mont. at 237-41, 745 P.2d at 1135-38. The case has nothing to do with conflict of interest or a motion to the District Court to disqualify an attorney from handling the case because he or she is currently representing the opposing party in that case.

¶173 Rule 1.7 (a) of the Montana Rules of Professional Conduct provides that a lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation.

¶174 It is undisputed that the Defendant in this case, Klemens, did not consent to its lawyer suing it in this case. It is also undisputed that Klemens was a client of the Marra firm, the firm representing the Plaintiff, on a number of other files. Finally, it is undisputed that after the motion to disqualify had been filed but prior to the hearing, the Marra firm fired Klemens as a client on all cases. The Marra firm then went to the hearing on the motion to disqualify and said that Klemens was a former client, not a current client, and therefore Rule 1.9 applied and not Rule 1.7. This "drop them like a hot potato" treatment of a client is conduct that should not be accepted by this Court. *Flatt v. Superior Court* (Cal. 1994), 885 P.2d 950.

¶175 The majority states the proper standard of review of attorney disqualification is whether the district court abused its discretion. I agree that it is within a district court's discretionary powers to grant a motion to disqualify under the facts of this case. A district court has the right and the duty to see to it that, in the context in the proceedings before it, attorneys conduct themselves in such a way to promote, not impede, justice and fairness.

¶176 However, the district court abused its discretion when it considered this situation as a former client representation as opposed to a current client representation. The *Flatt* case, cited with approval by the majority, makes it clear that an attorney should not be able to fire a current client and thereby avoid a current client disqualification argument.

¶177 The District Court in this case applied the former client test after the Marra firm fired Klemens and then determined that no substantial relationship existed between the alleged "former" representation of Klemens by the Marra firm and the instant case. On that issue alone the decision of the District Court should be vacated and the case remanded for consideration under the proper analysis. The District Court abused its discretion because it applied the wrong analysis.

¶178 I agree with the majority that the Rules of Professional Conduct arise out of the fundamental principle that an attorney, as a fiduciary, owes a duty of undivided loyalty to his or her client. The basis for Rule 1.7, M.R.Pro.C., is the principle that when a client engages the services of a lawyer to handle a given piece of business, that client is entitled to feel that, until that business is finally disposed of in some manner, he or she has the undivided loyalty of the one upon whom he or she looks as his or her advocate and champion. *Grievance Comm. v. Rottner* (Conn. 1964), 203 A.2d 82. If, as in this case, the client is sued by his or her own attorney, who is representing him or her in another matter, all feeling of loyalty is necessarily destroyed, and the profession is exposed to the charge that it is interested only in money. *See Grievance Comm.*, 203 A.2d at 84. Maintenance of public confidence in the bar requires an attorney who has accepted representation of a client to decline, while representing such client, any employment from an adverse party in any matter even though totally unrelated to the original retainer.

¶179 The Rules of Professional Conduct were not written in a vacuum. A district court should not have to hear a case in a vacuum. Rather, a district court should be able to rely on the Rules as an indication of the standard of conduct that is expected of attorneys in this state, especially as the Rules relate to conflicts of interest. In fact, the Supreme Court has demanded that each attorney comply with the Rules of Professional Conduct. To now state that a district court cannot look at the Rules of Professional Conduct for guidance and do what justice requires is a giant step backward.

¶180 In *Cinema 5 Ltd.*, the Second Circuit, in a case involving a request for disqualification of plaintiff's counsel because the defendant was represented by other members of plaintiff's counsel's firm, stated that the propriety of the conduct must be

measured against the duty of undivided loyalty which an attorney owes to each of his clients. *See Cinema 5 Ltd.*, 528 F.2d at 1386. The Second Circuit stated that where the relationship is a continuing one, adverse representation is *prima facie* improper and the attorney must be prepared to show, at the very least, that there will be no actual apparent conflict in loyalties or diminution in the vigor of his representation. *Cinema 5 Ltd.*, 528 F.2d at 1386. I would urge that Montana adopt this rule and place the burden on the party promoting the dual representation to prove no prejudice.

¶181 It is interesting that this is a case of first impression in Montana. I submit that the reason that it is a case of first impression is that the common understanding and the common conscience of the bar is in accord with Rule 1.7(a), and the great majority of attorneys would not involve themselves in such a situation and would not contest such a disqualification. The paucity of authority governing the situation where, as in this case, a lawyer is still representing the client whom he or she sues clearly indicates the frailness and the improperness of such action.

¶182 The phrase "appearance of impropriety" was used under the old canons and disciplinary rules with the admonition that such should be avoided. The Rules of Professional Conduct do not use that phrase but the standard should not be wholly abandoned in spirit. Certainly concerns about the public's perception of the legal profession bears some relevance when this Court views attorney conduct. While appearance of impropriety as a principle of professional ethics may be vague and open-ended, in this case it has meaning and weight. For a law firm to represent a client in one file, and sue it in another, creates an unsavory appearance of impropriety that is difficult if not impossible to dispel in the eyes of the public--or for that matter the bench and bar--by simply denying that prejudice will exist. Prejudice must be presumed.

¶183 Because of the need for public confidence and the fair and just administration of the law, the Court should conclude that the appearance of impropriety is so marked in this case that remand is necessary. This case is an example of situations in which an ordinary, knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of public disservice to either the public interest, or the interest of one of the parties. *See Whitman v. Estate of Whitman* (N.J.Super.Ct. Law Div. 1992), 612 A.2d 386.

¶184 In summary, the trial court erred in its analysis of the situation before it concerning disqualification by reviewing this situation as a "former" client rather than a "current"

client case. It allowed the Marra firm to fire its client and apparently take the better of the cases before it. Under these facts and circumstances I would find that the District Court abused its discretion when it denied the motion to disqualify the Marra firm. While it may not be necessary to do so, I would also urge the adoption of the legal principle that in a case involving an attorney suing a client such representation is *prima facie* improper and the attorney who seeks to represent both must come forward with substantial supporting facts to indicate prejudice will not result and vigorous representation can be maintained on behalf of both clients. The burden of proof should be with the attorney who is stepping on the lip of that slender reed referred to in *Cinema 5 Ltd*. When that reed breaks, public trust is gone, client rights are violated and the attorney's professional reputation is harmed. It is for these reasons that I dissent.

/S/ GARY L. DAY

District Judge sitting for Justice W. William Leaphart

1. Following entry of the default judgment on liability and prior to trial on damages, the court granted for Klemens' counsel's motion to withdraw on April 29, 1998. The underlying reason for the withdrawal, ironically, was a conflict of interest pursuant to Rule 1.7, M.R.Pro.C. Klemens' insurance carrier asserted it would hold counsel for Klemens responsible for any damage award, claiming counsel was professionally negligent for the discovery rule sanction default. On appeal, Klemens' former counsel, n/k/a James, Gray, Bronson & Swanberg, filed an *amicus curiae* brief.

2. The court noted that Schuff's contingency fee with the Marra firm for pursuing litigation beyond settlement was 50 percent, thus the judgment against Klemens included attorney's fees of $202,287 for the Marra firm's contingency fees for its settlement with the other defendants, and $295,898, representing 50 percent of the jury verdict less collateral sources and offsets.

3. As this Court observed in *Carlson*, unlike other states that adopted the American Bar Association's Model Rules of Professional Conduct, Montana did not adopt the Preamble. We nevertheless observed in *Carlson* that "this portion of the Preamble aptly states the thinking and rationale of those who developed a complicated scheme by which to judge the conduct of attorneys in various and disparate matters . . ." *Carlson, 229 Mont. at 238, 745 P.2d at 1136.*

4. Unlike Montana, other states' appellate procedural rules expressly provide that a trial court's ruling on a motion to disqualify counsel automatically gives rise to an interlocutory appeal. *See generally Hasco, Inc. v. Roche* (Ill.App.Ct. 1998), 700 N.E.2d 768, 772 (stating that state supreme court rule amended in 1996 now allows for permissive appeals of orders granting motions to disqualify counsel).

5. The District Court's amended judgment set the damage award at $978,685.96.

6. It is apparently the theory of Schuff's attorneys that their 50 percent contingent fee is deducted from the gross amount of the verdict before any allowable offsets and that the offsets are deducted from Schuff's net recovery. We do not address the merits of that questionable assumption because the issue is not currently before us.